STEPHEN SMITH SELLICK *v.* HANSON KELLY and others.

Under art. 275 of the Code of Practice, or under the 9th section of the act of 7th April, 1826, to obtain a sequestration, the applicant must make oath that he fears that the party having possession of the property may remove it beyond the limits of the State during the pendency of the suit. It is not any privilege or mortgage which the creditor has on the property, but the circumstance which · causes him to apprehend that its removal may deprive him of his recourse upon it, that gives the right of sequestration. The requisites for obtaining a sequestration under the act of 1826, where the party has a lien or privilege on the property, are the same as under section 6 of art. 275 of the Code of Practice, in cases in which the creditor has a special mortgage.

Where a sequestration has been illegally issued, the true standard of damages is the probable loss sustained by the defendant in consequence of having been deprived of

the free use or disposal of his property. He should be placed as nearly as possible in the situation he would have been in, had the sequestration not been issued.

APPEAL from the District Court of the First District, *Buchanan, J.*

*Frazer*, for the plaintiff.

*C. M. Jones*, for the appellants.

SIMON, J. The defendants, sued upon a sequestration bond, are appellants from a judgment by which they are made liable to pay, *in solido*, to the plaintiff, the sum of fifty dollars, as damages sustained by the latter in consequence of the wrongful suing out of a writ of sequestration, issued at the suit of Hanson Kelly & Co. On the other hand, the plaintiff complains in his answer that the judgment appealed from is erroneous, in not allowing him damages to the full amount of the bond, and he prays that said judgment be so amended as to authorize him to recover of the appellants, *in solido*, the sum of eight hundred dollars.

This suit was instituted under the following circumstances: It appears that, on the 24th of March, 1842, Hanson Kelly & Co. filed their affidavit in the Commercial Court, in which they swear that the appellee and the steamboat Angora, of which he was owner, *were justly indebted to them in the sum of $438 75, due for goods, stores, provisions and supplies furnished said steamer and for her use, for the payment of which they had a privilege on said boat, which they prayed might be sequestered.* Their bond was also filed with their affidavit, for the sum of eight hundred dollars, with Clymer, Britton & Swift, as sureties, conditioned as the law requires; whereupon a writ of sequestration was sued out, which, on the same day, was levied upon the steamer Angora, her machinery, furniture, &c., then about leaving New Orleans for Bayou Sara, with freight and passengers. She was permitted by the sheriff to proceed on her trip, on security being given for the return of the boat within four days. She was returned according to agreement and delivered to the sheriff, who took her in his possession, and kept her sequestered until the 11th of April following, when the appellee bonded her to release the sequestration. On the 12th of April, the boat was seized by the marshal of the United States District Court, and taken

possession of by him, and, on the 23d of May, she was sold for $595.

In the mean time, however, the proceedings went on in the original suit, and a motion having been made in the Commercial Court for a rule on the plaintiffs, to show cause why the sequestration should not be set aside, on the grounds filed, said rule was made absolute, on the 6th of April, 1842; and a judgment was rendered, on the 28th of the same month, in favor of the plaintiffs against the appellee, for the whole amount claimed in their petition. On the 27th of May, an execution was issued thereon, which, on the second Monday in July following, was returned, "No property found."

It is established by the testimony of divers witnesses that the steamer Angora was running from New Orleans to Bayou Sara, that she made weekly trips, and was doing a good business, by carrying freight and passengers. She was loaded, had her passengers on board, and was just about leaving the city, when she was sequestered. The steamer was taken by the sheriff across the river, and, in taking her across, they ran her on some spiles, and broke her guards through. This injury was done whilst she was in the possession of the sheriff. Since that time, plaintiff has not run any boat of his own in the Bayou Sara trade; and the first witness states that, from his knowledge of the receipts and expenses, the Angora was making from $100 to $200 a trip, over and above the expenses. He also states that when the boat was seized, she had a sufficient supply of kitchen utensils on board, and various articles of provision, worth at least $50, which were all missing when she was taken across the river.

Another witness testifies that he was running a boat in that trade, doing a good business, and had stopped two or three weeks before the plaintiff's boat was seized. He gave his freight to plaintiff, and went up the river to solicit his friends to give their business to Capt. Sellick, and his, witness', average profit to Baton Rouge was between $200 or $300 every trip. He thinks plaintiff would have got all the business which he, witness, had. A third witness proves also the accident that happened to the boat when she was taken across the river; and thinks the injury done to plaintiff by the seizure of his boat was

considerable. He says that he attributed the accident to the negligence of those bringing her out, and that the Angora stood as high at the insurance office as any boat in the trade. The first witness being recalled, adds, that the seizure must have been an injury, and that he would not take $5,000, to stop running in the summer, if he had the means to carry on.

A fourth witness declares that the plaintiff's business was broken up by the seizure of his boat, and that he has run no boat since. He would say that capt. Sellick has been damaged considerably by said seizure, and by being thrown out of business; that the business gets into other hands, and it is difficult to get it back again. The witness gives a statement of the circumstances relative to the absconding of plaintiff's clerk, a short time before the seizure, with $1400 of the plaintiff's own money; and this was the cause of plaintiff's being behind in the payment of his bills. He says that if plaintiff had been in his debt at the time, this circumstance would have induced him to extend indulgence to him, rather than seize his boat. When a steamboat is once seized, all the creditors come in and seize also. The boat was purchased by the witness and plaintiff for $8,000, and plaintiff became subsequently owner of the entire boat. This boat was the only means plaintiff had of supporting himself and family, and he was damaged at least $2,000 by its being seized by defendants. The boat did not make any trip after the seizure ; she was seized as she was going out, but went up that trip, and never ran afterwards.

Two other witnesses state also, that when a boat is seized by one person, it is the cause of suits and seizures by all the other creditors. It is then useless to bond the boat, as security would be required for each creditor and in different courts.

With this evidence before him, the judge *a quo*, being of opinion that the sequestration had been illegally obtained, and that the defendants were bound to pay the damages which the plaintiff had sustained from its having been sued out, thought, that although it was shown that plaintiff was doing a very good business with his boat when it was seized, yet, as she was also seized by the United States marshal, the only damage which seemed to be proved as having been caused by the seizure at the

suit of the defendants, was the loss of certain stores and other articles amounting to $50, missing from on board while the boat was in the hands of the sheriff; and he gave judgment accordingly.

It is perfectly clear that the sequestration complained of was illegally and improperly sued out. The claim of the defendants against the plaintiff was based upon *a right of privilege* which he had on the boat for the payment of the debt sued on ; and the prayer of his petition is, that the judgment to be rendered be satisfied by privilege on said boat. This is also the purport of the affidavit upon which the writ of sequestration was ordered to be issued, and was issued, although nothing is said in the affidavit in relation to *the creditors apprehending that the boat would be removed out of the State before they could have the benefit of their privilege.*

Now, the 6th paragraph of art. 275 of the Code of Practice, requires, in positive terms, that such an oath should be taken by a creditor, by special mortgage, who seeks to exercise the power of sequestering the mortgaged property ; and by the *9th section of an act of* 1826 (B. & C.'s Dig. p. 774), it is provided, that *in addition to the cases mentioned in said article, the plaintiff may obtain a sequestration in all cases where he has a lien or privilege upon property, upon complying with the requisites of the law.* Thus, the right of sequestering property is extended to all sorts of liens or privileges which may exist upon it, so as to secure the exercise of such lien or privilege, when the creditor apprehends that the property may be removed out of the State ; and as this court said, in the case of *Debaillon v. Ponsony* (5 Mart. N. S. 42), we understand the requisites necessary to obtain the sequestration under the law of 1826, to be the same as those required for obtaining the writ on a special mortgage. It is not the privilege that gives the right of sequestering the property, but it is the circumstance which causes the creditor to apprehend that the removal of the property out of the State may deprive him of its exercise, that entitles him to this extraordinary remedy, so as to preserve the property during the pendency of the suit, and prevent its being removed before he can have the benefit of his privilege ; and it is necessary that he should make oath to the

facts which may have induced his apprehension. This oath was not taken in the original suit; the sequestration was properly set aside; and the judge *a quo* did not err in the view which he took of the law governing this case.

With regard to the question of damages, however, we cannot agree with him. The writ of sequestration, which is a very severe mode of proceeding, only to be resorted to as a remedy intended for extreme cases, and in those cases only specially pointed out by law, subjects the party who resorts to it, to pay such damages as the defendant may sustain, in case such sequestration should have been wrongfully obtained. It is true those damages ought not to be vindictive; but as this court said in the case of *Stetson et al.* v. *Leblanc et al.* (6 La. 271), the true standard should be the probable loss sustained in consequence of the party being deprived of the free use or disposal of his own property; and he should be placed as nearly as possible in the situation he would have been in if the sequestration had never been issued. Here, there was no cause whatever for the sequestration; and yet, the defendant was deprived of the use and enjoyment of his boat, which, as one of the witnesses says, was the only means he had to support himself and family. All the witnesses say that he was considerably injured by the seizure; that his business was broken up; that he lost considerable profits in a very important season of the year; and they generally estimate the damages which he may have sustained from this interruption in his trade, and even those which he did really sustain, at an amount *far above the claim* set up in the petition, under the sequestration bond. It is true the boat was subsequently seized by the United States marshal, after she had been only about fourteen days in the possession of the sheriff; but the injury was already done; the appellee's business was broken up; and it seems from the evidence, that the subsequent seizure was the necessary consequence of the harsh and severe remedy which the appellants had thought proper to resort to. Under such circumstances, and in the absence of any right in the appellants to issue the sequestration complained of, nay, of any evidence to show even the least probable cause or suspicion to justify their proceedings, we are satisfied that the

plaintiff and appellee, having satisfactorily shown the loss by him sustained to be above the amount of the bond sued on, judgment ought to have been rendered below in his favor for the sum of eight hundred dollars, as a just compensation for the damages by him sustained.

It is, therefore, ordered and decreed, that the judgment of the District Court be annulled and reversed, and that the plaintiff and appellee do recover of the defendants and appellants, *in solido*, the sum of eight hundred dollars, with legal interest per annum thereon, from the date of this decree until paid, with costs in both courts.