## GAINES *v.* CITY OF NEW ORLEANS.[1]

*(Circuit Court, E. D. Louisiana,* May 3, 1883.)

1. EQUITY JURISDICTION.

A bill for a discovery lies, even when the action to be supported sounds in tort.

2. SAME—ACCOUNTING—RENTS AND PROFITS OF REAL ESTATE.

In a suit for an accounting as to the rents and profits of real property for a period of 45 years, which must be taken according to the laws of Louisiana, and wherein the defendant must be charged with the rents and profits which have been, or ought to have been, annually received, and credited with the yearly expenditures for reclamations, improvements, and taxes; and when such an account has reference to hundreds of lots of ground,—it is of a most complex and involved character, which could not be dealt with upon a trial at law at *nisi prius,* and the complexity of the account is, therefore, a ground of equity jurisprudence.

3. SAME.

In a case where the complainant has recovered judgment against several hundred actual tenants for rents and profits for varying portions of a long period, and those tenants are insolvent, and the defendant is the warrantor of all those tenants, and whatever they owe the complainant the defendant owes to them; and when the defendant is not only a warrantor, but a warrantor in bad faith, who has enriched herself by purchasing in bad faith the complainant's property and selling it at a large profit,—the complainant, having no remedy at law upon this warranty for want of privity, has a right of action in equity.

*Riddle* v. *Mandeville,* 5 Cranch, 322.

4. SAME.

Equity will not allow a party, ultimately liable, to keep, for his own advantage, an intermediate and insolvent party in possession, who is, in return, responsible to the lawful owner, and thereby enrich himself out of the property of that owner thus dispossessed, and escape liability to him for want of a mode of action.

5. RENTS AND PROFITS.

According to all the authorities, both under the common law and the law of Louisiana, a suit for rents and profits could not have been brought until the complainant had recovered possession.

*Gaines* v. *New Orleans,* 15 Wall. 633.

6. EJECTMENT—TRUST.

In an ejectment bill against a party holding by an adverse title, there could be no trust raised up as to the price received by him in case of sale.

7. POSSESSOR IN BAD FAITH.

The possessor in bad faith is bound to surrender the thing immediately; and the seller and warrantor, who took and conveyed in bad faith, is bound forthwith to restore the price to his vendee, and to acquit, *i. e.,* discharge, for him his liability to the owner for fruits, without suit or condemnation.

8. SAME.

He who, with a motive to deprive another of that which he knows is justly that other's, employs the process and machinery of the courts, is under obligation to satisfy all damages which that other thereby suffers. The damages springing from the legitimate exercise of legal rights, even when there is an absence of malice, and there is good faith, must, according to the settled law of Louisiana, at least place the injured party in the situation in which he would have been if the disturbance had not taken place.

9. WARRANTY AND WARRANTOR.

The warrantor is, by the settled jurisprudence of Louisiana, the real defendant. The judgment is binding upon the warrantor if he has been called in warranty, or he is apprised of suit having been brought.

[1] Reported by Joseph P. Hornor, Esq , of the New Orleans bar.

10. SAME—BAD FAITH.

Where a party had, in bad faith, entered upon the property of another and for an enormous price ($500,000) sold and conveyed it with warranty, and to avoid his liability as vendor and warrantor, *i. e.*, to escape being compelled to return to his vendee the price, and repay the fruits which the evicted vendee would be required to pay to the owner, in bad faith, hinders the restitution of the land and its fruits to the owner, and keeps the owner from recovering possession for a period of 50 years, the owner can recover for the rents and profits from the party hindering as a constructive possessor.

11. RENTS AND PROFITS.

In ascertaining the rents and profits of real estate, where the disseizin and possession have been in bad faith, the account must include not only the rents, revenues, and values for use actually received, but also those which the evidence shows would have been received with ordinary good management. Since the law requires the court in such a case to decide from evidence extrinsic to the actual receipts, satisfactory evidence may be found in the rents for the very period in question actually derived from numerous other lots, adjacent, similarly situated, and no better capacitated, and from ground rents during and for the same period.

*Pontchartrain R. R.* v. *Carrollton R. R.* 11 La. Ann. 258, 259.

*McGary* v. *City of Lafayette,* 12 Rob. (La.) 668 ; 4 La. Ann. 440.

12. SAME.

The burden which bad faith places upon the defendant, according to the civil law and the jurisprudence of Louisiana, while it should lead to the assessment of no damages or compensation beyond those actually suffered, requires the court to adopt conclusions fully warranted by evidence, though, through the fault of the defendant, it be derived in part from the rents and profits of other property adjacent and similarly situated, and no better capacitated.

13. SAME.

An account for rents and profits should be taken and stated as follows : The rent or income should be ascertained for each year separately, and upon the amount so ascertained for each year interest should be computed down to the time when the account closes, so that there may be interest upon each yearly sum falling due, but no interest upon interest.

*Gaines* v. *New Orleans,* 15 Wall. 634.

*Wm. Reed Mills* and *Alfred Goldthwaite,* for complainant.

*J. R. Beckwith* and *E. H. Farrar,* for defendant.

BILLINGS, J.   This cause is before me on a submission for a final decree upon bill, answer, replication, exhibits, and depositions, and upon exceptions to the report of the master.   There can be no doubt but that this cause is one over which a court of equity must take jurisdiction.   It is an incident, and, in its nature, a supplemental proceeding, to a litigation as to the heirship and title of the complainant to certain real property, which has been conducted in this court between the parties hereto for upwards of 40 years, and always upon the equity side of the court.   It is a suit for a discovery as to the means which have been employed by the defendant throughout this long period to prevent and hinder the complainant from recovering possession of this real property.   See Comyn, Dig. "Chancery 3 B 1," where it is laid down that a bill for discovery lies even when the action to be supported sounds in tort.   It is a suit for an accounting as to rents and profits of this real property for the period of 45 years, which must be taken according to the laws of Louisiana, and in which, therefore, the defendant must be charged with the

rents and profits which have been or ought to have been annually received and credited with the yearly expenditures for reclamation, improvements, and taxes, and that, too, with reference to hundreds of lots of ground. It is an account, the correct statement of which by the master occupies 300 pages, and upon which the record shows he has been occupied almost three years. It is, therefore, an account of a most complicated and ramified character, which could not be dealt with upon a trial at law at *nisi prius.*

The fact that the constitution of the United States guaranties to all suitors in common-law cases, where more than $20 is involved, a trial by jury, should insure precision on the part of courts in discriminating as to the proper character of causes, but cannot change the answer to the question as to whether a cause is of equitable cognizance. That must depend upon whether it be such a cause as the English court of chancery would have taken cognizance of at the time of the adoption of the constitution of the United States.

The case of *Root* v. *Ry. Co.* 105 U. S. 189, relied on by defendant, by no means excludes this case from the equity courts. On the contrary, while it holds that where there is no element of trust, and where there are no other special circumstances which would authorize jurisdiction in equity, an action for an account is an action at law; it adds the express reservation (page 216) that "an equity may arise out of, and inhere in, *the nature of the account itself,* if it render a remedy in a legal tribunal *difficult,* inadequate, and incomplete."

In *Hipp* v. *Babin,* 19 How. 271, there is the same exception made. That was a suit for a naked accounting as to rents and profits. There were no equity features. The court in declining jurisdiction (page 279) says: "To authorize jurisdiction it must appear that the courts of law could not give a plain, adequate, and complete remedy;" and that that case did not show that justice could be administered with less expense and vexation in a court of equity than in a court of law."

In *Ex parte Bax,* 2 Ves. Sr. 388, Lord HARDWICKE said:

"In an action at law an account is to be taken by auditors. Indeed, where the auditors have taken the account, and on charging and discharging the items issues may be joined, and so many issues then may be tried, actions at law, therefore, for accounts are so few because so long time is required."

In *O'Connor* v. *Spaight,* 1 Schoales & L. 309, Lord REDESDALE said, (this was an action for an account by a landlord against a tenant for rent:)

"The ground on which I think this is a proper case for equity is that the account has become so complicated that a court of law would be incompetent to examine it upon a trial at *nisi prius* with all neccessary accuracy. * * * This is a principle on which courts of equity constantly act by taking cognizance of matters which, though cognizable by courts of law, are yet so involved with a complex account that it cannot properly be taken at law."

In *Corporation of Carlisle* v. *Wilson,* 13 Ves. Jr. 278, the lord chancellor (ERSKINE) says:

"The principles upon which courts of equity originally entertained suits for an account when a party had a legal title, is that, though he might support a suit at law, a court of law either cannot give a remedy, or cannot give so complete a remedy as a court of equity."

In *Weymouth* v. *Boyer,* 1 Ves. Jr. 424, Mr. Justice BULLER, sitting for the chancellor, (Lord THURLOW,) says:

"We have the authority of Lord HARDWICKE that if a case was doubtful, *or the remedy at law difficult,* he would not pronounce against the equity jurisdiction. The same principle has been laid down by Lord BATHURST."

In *Fowle* v. *Lawrason's Ex'r,* 5 Pet. 495, the supreme court says:

"In all cases in which an action of account would be the proper remedy at law, the jurisdiction of a court of equity is undoubted. In transactions not of the peculiar character of those in this case, *great complexity* ought to exist to give jurisdiction."

In *Barber* v. *Barber,* 21 How. 591, the court says:

"It is not enough that a court of law also has jurisdiction; the remedy at law must be as practicable and efficacious to the ends of justice and its prompt administration to exclude."

In *Mitchell* v. *Great Works Manuf'g Co.* 2 Story, 653, Justice STORY, overruling a demurrer to a bill for an account, says: "Considering the complications and changes of interest, the claims cannot be adequately examined except in a court of equity."

In *Nelson* v. *Allen,* 1 Yerg. 372, the court say:

"It is contended by the defendants that, as the plaintiff's title is a pure legal title, he has a remedy at law for the mesne profits, and that, if his bill had been demurred to, it would have been dismissed. This position is wholly gratuitous, unsupported either upon principle or authority. It has been overlooked by them that courts of equity have concurrent jurisdiction with courts of law in cases of account."

See, also, Judge WHYTE's review of the English cases at page 373. "So there shall be an account in equity for mesne profits." Comyn, Dig. "Chancery 2 A 1." "But not till possession has been recovered, as trespass will not lie at law for them till then." Comyn, Dig. "Chancery 2 A 2."

"Equity will decree an account of rents and profits whenever the account is intricate and complicated, and therefore not easily adjusted at law. And this holds not only where the matters grow out of a privity of contract as between landlord and tenant, but in many cases of adverse and conflicting claims." Holc. Eq. 85. See, also, 1 Mad. Ch. 868; Cooper, Eq. Pl. 134; *Ludlow* v. *Simond,* 2 Caines' Cas. 40, per THOMPSON, J.; *Knotts* v. *Tarver,* 8 Ala. 743; and *Printup* v. *Mitchell,* 17 Ga. 558.

From an early date equity decreed an account of mesne profits when there were particular circumstances which involve an equity.

By the lord keeper, in *Tilly* v. *Bridges*, Prec. Ch. 252. This exception includes all cases which involve an equity which cannot be made available at law. 1 Fonbl. Eq. marg. pp. 14 and 15, and note, (4th Am. Ed. by Laussat.) If the recovery of the demand had been unconscientiously obstructed, that of itself constituted an equity. *Curtis* v. *Curtis*, 2 Brown, Ch. 633, per Sir LLOYD KENYON, afterwards Chief Justice and Lord KENYON.

The *gravamen* of the bill of complaint is that the defendant, by her direct efforts, persisted in *mala fide*, has kept the complainant out of possession for 47 years, and until any remedy by an account at law is practically impossible. This allegation alone, according to the principle laid down in *Pulteney* v. *Warren*, 6 Ves. 73, would give jurisdiction.

But there is another distinct ground of equity jurisdiction here. The complainant has recovered judgment against several hundred actual tenants for rents and profits for varying portions of this long period. These tenants are insolvent. The defendant in this action is the warrantor of all those tenants, and whatever they owe the complainant the defendant owes to them. The defendant is not only a warrantor, but she is a warrantor who has enriched herself by purchasing in bad faith the complainant's property and selling it at a profit of $500,000. This sum she has retained, and has had the use of since the year 1837. The complainant has no remedy at law upon this warranty from want of privity. Equity, therefore, gives her a right of action. This case is, in principle, the case of *Riddle* v. *Mandeville*, 5 Cranch, 322, where "an indorser of a promissory note, who had been adjudged to have no remedy at law against a remote indorser, was held to be entitled to maintain a suit in equity against him, on the ground that the defendant, as the original indorser of the note, was ultimately responsible for it, and that equity would decree the payment to be made immediately, by the person ultimately responsible, to the person actually entitled to receive the money." Page 329.

It is but another application of the principle laid down by Mr. Story in his Equity Jurisprudence, § 687, that where an owner and lessor would have no action at law against an under-tenant upon his covenant for rent, still, if the original tenant was insolvent, equity would give the owner a direct action against the under-tenant. The reason assigned by Mr. Story is that the under-tenant should not be permitted to enjoy the profits of possession without accounting to the original lessor, because, if the original lessee had paid, he would have had a remedy over against the under-tenant.

It is but another application of the well-settled principle recognized in the familiar case put by Chief Justice MARSHALL, Id. 5 Cranch, 330, of a right of action by a creditor of an estate against the legatees of his debtor. "If," says Chief Justice MARSHALL, "doubts of his right to sue in chancery could be entertained while the executor was solv-

ent, none can exist after he has become insolvent. Yet the creditor would have no legal claim on the legatees, and could maintain no action at law against them. The right of the executor, however, may in a court of equity be asserted by the creditor, and as the legatees would be ultimately responsible for his debt, equity will make them immediately responsible.

The principle here to be invoked, and which is controlling, is that equity will not allow a party ultimately liable, for his own advantage, to keep the owner out of possession, and an intermediate and insolvent party in possession, who is, in turn, responsible to the lawful owner, and thereby to enrich himself out of the property of that owner, thus possessed, and escape liability to him for want of a mode of action.

This principle is laid down in broader terms by Lord Justice TURNER in the case of the *Emperor of Austria* v. *Day & Kossuth,* 3 De G., F. & J. (64 Eng. Ch.) 217, thus:

"The highest authority upon the jurisdiction of this court, in enumerating the cases to which the jurisdiction of this court extends, mentions cases of this class where the principles of law by which the ordinary courts are guided give no right, but upon principles of universal justice the judicial power is necessary and the positive law is silent."

The conclusion, therefore, is unavoidable that this suit is properly brought as a suit in equity:

(1) Because, as a bill for discovery of the participation of the defendant in, and her advantage from, the provoking and maintaining a litigation which, commenced in bad faith, has, upon various pretexts, been made to keep the complainant out of the enjoyment of a large inheritance for 47 years; and,

(2) Because, whether the bill of complaint be viewed as an incident to a litigation which has lasted in a court of equity for half a century, calling for an account for rents and profits for that whole period, as to a vast number of separate lots, and calling for a distinct and detailed statement of account for each lot, under a system of law by which, on the one hand, the annual profits or value for use, and on the other hand the yearly disbursements for ameliorations and taxes, must be ascertained and stated, and where it is made to appear that this exhaustive complexity is altogether due to the hindrances which have been interposed by the defendant; or whether the bill of complaint be viewed as leveled at a defendant who, under an obligation to indemnify a possessor in case of eviction, and for the purpose of retaining an enormous price unjustly obtained, and avoiding a liability for fruits which must be rendered to the real owner upon her recovery of possession, has, directly as well as through that possessor, by all manner of legal artifices, in bad faith, kept that owner out of possession of her own, that possessor having no means wherewith to respond to the owner when evicted and adjudged to deliver up the property with its fruits,—whether the bill of

complaint is viewed with reference to either of the distinct grounds
which it presents for equitable jurisdiction,—a fortiori, if it be viewed
with reference to all,—it states a case over which a court of equity
has undoubted cognizance.

As to the cause upon the bill, amended bill, answer, pleas, and
proofs. The averments of the bill which it is necessary to consider
are as follows: That the complainant was the legitimate daughter
of Daniel Clark, and by his last will and testament (will of 1813)
became his universal legatee and inherited the property known as
the Blanc tract, which is set out in the bill by metes and bounds;
that in the year 1834 the First Municipality, a corporation whose
property and liabilities were, by the amended charters, transmitted
to the present city of New Orleans, fraudulently obtained possession
under a pretended title of the said Blanc tract, and in the year 1837
divided it into squares and lots, and for a price exceeding $400,000
conveyed it to a multiplicity of grantees, who, by mesne conveyances,
granted in parcels and subdivisions said tract to tenants, who, as
well as the original and intermediate grantees, took in bad faith.
The bill further avers an eviction and recovery by the complainant
against these tenants for the entire tract, and for fruits for portions
of the time of disseizin; their insolvency; that the defendant is a
warrantor of all said tenants; was notified, and, in fact, made the de-
fenses in the suits terminating in the judgments for eviction and for
fruits; that a separate suit for a portion of this tract was commenced
and maintained against the defendant, in which all of the facts and
propositions of law relating to complainant's title and the liability
and wrong-doing of the defendant were judicially determined; that,
in spite of the requests of the tenants to surrender to the complain-
ant, the defendant compelled them by threats to allow her to con-
tinue the defenses; that, as a final resort, when the rights of the
complainant had been, after 35 years of litigation, fully established
by the probate of the spoliated will of Daniel Clark, by the supreme
court of this state, and by the complete establishment of the rights
of the complainant to this property, as against the defendant, by de-
crees between these parties by the supreme court of the United
States, the defendant, in the year 1867, caused a suit to be insti-
tuted for the pretended purpose of revoking the probate of the will
of Daniel Clark, and thereby delayed and hindered the complainant's
recovery for a further period of 10 years; that all this delay and
hindrance has been caused by the defendant alone for the purpose of
enriching herself by thereby saving herself from her ultimate lia-
bility upon her warranty for the return of the price and for fruits
and revenues; and upon these averments the complainant demands
judgment against the defendant for the rents which were received,
and which ought to have been received, and which the complainant
would have received but for the alleged long-continued and enormous
wrong of the defendant.

The defenses contained in the answer of the defendant are, in substance, a denial of the bill, as well as (1) plea of prescription of one, two, and three years; (2) good faith of the defendant; (3) reduction of amount alleged by the bill to have been received for the property at public auction; (4) collusion in the case of *Gaines* v. *Hennen;* (5) denial of insolvency of the tenants; (6) plea that the judgment in the case of *Gaines* v. *City of New Orleans* is such an adjudication as precludes complainant from bringing this suit; and (7) irregular and fraudulent character of some of the judgments in the Agnelly and Monsseaux, *i. e.* the possessory, suits.

I will consider these defenses *seriatim:*

(1) Prescription. This is a suit which, according to all authorities, both under the common law and the law of Louisiana, could not have been brought until the complainant had recovered possession. *Gaines* v. *City of New Orleans,* 15 Wall. 633. Her judgments in the Agnelly and Monsseaux cases, wherein she recovered judgment for possession and for partial fruits, were rendered May 7, 1877, and therefore did not become final until May 3, 1879. This present suit was filed August 7, 1879. All ground, even for discussion as to prescription, is wanting.

(2) Good faith of the defendant. This issue has been absolutely and finally settled adversely to the city of New Orleans, in *Gaines* v. *City of New Orleans,* 6 Wall. 642, and 15 Wall. 633.

(3) As to the amount of price received from the sale of the Blanc tract at the public auction in 1837. The report of the master and the adjudication shows the aggregate amount derived from this sale to have been $482,525, besides $86,405, the amount of price of adjudication of certain lots for which no evidence of deeds of sale appears. Master's Report, p. 24.

(4) As to any alleged collusion between the parties in the case of *Gaines* v. *Hennen,* there is not a scintilla of evidence in the record in support of this averment; and it becomes of little moment except as bearing upon the question of good faith of the defendant. This has, as has been observed before, been settled, and is no longer an open question.

(5) The matter of the insolvency of the tenants appears by the testimony of Florville Foy and Jules Vienne.

(6) Plea that the judgment in the case of *Gaines* v. *City of New Orleans* is such an adjudication as precludes the complainant from bringing this suit. The suit here referred to is known in this record as suit No. 2,695. It was an ejectment suit, conducted on the equity side of this court as a suit in part for discovery. It was filed originally with reference to the whole Blanc tract. The defendant's answer contained a disclaimer as to any title or possession of the tract except that square upon which was situated the draining machine and some other small pieces. The answer disclosed the names of the occupants who were alleged to be in possession of the rest of the tract.

Upon the coming in of defendant's disclaimer the complainant took no further proceedings as to the portion of the tract covered by it, and the cause proceeded and the judgment was with reference to the portion as to which possession was not disclaimed. There was no judgment upon the disclaimer. In fact no issue was joined upon it. The judgment has precisely the same scope and effect as if the bill, as originally filed, had sought a discovery and recovery of property and fruits as to the square occupied by the drainage machine alone, and the other squares not included in the disclaimer. Indeed, after the disclaimer it became necessary that the possessory actions against the occupants should be commenced and terminated before this present action would lie. An exception was made after the cause had come back from the supreme court and was before the court upon the master's report, which presented the question whether the complainant could treat the city as a trustee for the price received by her for the Blanc tract. The question was solved by the court declaring that in an ejectment bill against a party holding by an adverse title there could be no trust raised up as to the price received, in case of sale of a portion; i. e., that the whole aim of the bill was inconsistent with the claim thus urged by the exception. This ruling and decree can by no construction be made to be adverse to, or even relate to, the claim presented here. This claim is not only not inconsistent with the ejectment suit, but follows and could only follow as a consequence from that suit and the recovery in the possessory suits. The revenues upon which the master has reported are those derived or derivable from lands not included in the suit No. 2,695, after the disclaimer and not embraced in the judgment.

(7) That some of the judgments against the tenants (in the Agnelly and Monsseaux suits) were irregular and fraudulent. The evidence which seems to be relied upon is that in some of the instances, in which judgments *pro confesso* were entered, the subpœnas are not in the records. This by no means overcomes the *prima facie* case made by the judgment itself, as it cannot be presumed the court would have rendered it without proof of service of process. I do not find that the special defenses are in any respect sustained.

The exceptions to the report of the master are for the most part treated and disposed of in the subsequent portions of the opinion. As to those not there discussed which have been filed by the defendant:

(1) As to the order of reference. I take it, it is not to be disputed that the court may order a reference of any part of an equity cause, whenever, in its opinion, the ends of justice require it, and the matter referred can be considered by the master consistently with the rules of pleading and evidence. This order was made by the court in anticipation of the long time necessary to take and state this intricate and prolonged account, and with the purpose of putting into force the condition and stipulation upon which the judgment

against the defendant, taken *pro confesso,* had been vacated, viz.: To speed a cause which sought to enforce a right to an inheritance, the contest as to which had been prolonged far beyond two average human lives, and with respect to which the controlling principles had been settled never to be shaken. The thing as to which the account was directed to be taken was specifically defined, and the rules upon which it was to be taken were clearly set out in the order of reference. The only question worthy of any consideration, with reference to such an order, would be whether it was made at a point in the litigation, when a reference of the matter committed to the master could be had without prejudice to the rights of the litigants. The demurrer to the whole bill had been overruled, after a very full argument, and the court had announced its opinion to the effect that that portion of the bill, and that alone, was good by which the complainant sought to recover from the defendant the rents which she might and would have derived from that part of the Blanc tract from which she had been kept out of possession by the devices of the defendant, through her warrantees who occupied. Leave, accordingly, was given to the defendant to still demur to the rest of the bill, and a reference was directed to ascertain the rents and profits which the complainant would have derived had she been allowed to remain in undisturbed possession. See Decree, March 27, 1880. This inquiry was just as capable of being conducted at that point in the progress of the cause as after a decree upon the evidence. The complainant, in acting upon the order, incurred the risk of the costs of the reference, in case she should obtain no decree upon the evidence when the cause should have been finally submitted. The defendant was in no respect prejudiced, and was deprived of nothing but the opportunity for causing still further delay.

(2) As to the exception that the master has not reported upon certain questions. Nothing was referred to him except to take and state the account of rents and profits as to the tract of land known as the Blanc tract,—both those realized and those which might have been acquired with ordinary good management.

(3) As to the exception that, in some respects, the master has not correctly located the tract. The court finds that the location adopted by the master is confirmed by the contemporaneous maps offered as exhibits in this cause.

(4) As to the exception that the master has carried on the charges for rent after the judgments of eviction. This exception is founded on a misapprehension. The master's report shows that he charges the defendant with rents only up to the date of eviction, under the Agnelly and Monsseaux judgments, although he has properly continued the allowance of interest upon the rent dues, or amounts of rents, till judgment. The other exceptions to the master's report on the part of defendant have been considered in the opinion and are overruled. As to the exception to the master's report on the part of the

complainant, it is allowed to the extent and for the reasons set forth in the opinion. The additional exception as to the property conveyed to McDonogh, and by him bequeathed to the city of Baltimore, is also founded on a misapprehension. The account is brought down only to 1848, the date of the conveyance from the defendant to McDonogh.

.The question remains whether the complainant has substantiated her bill, and, by the proofs, made such a case as to entitle her to a recovery. The complainant's title—that is, her capacity to take; her heirship; her legitimacy; the will, and her right to inherit under it; the entry into possession of this Blanc tract by the defendant; that the defendant in bad faith took her title and sold the property and received the price, and in all her relations to said property is to be deemed a person dealing in bad faith; that complainant has not renounced her title; and the legal identity of the First Municipality and the city of New Orleans, the defendant,—all these facts and issues have been settled beyond question by the supreme court of the United States by a solemn judgment between these parties. See record in suit, *Gaines* v. *City of New Orleans*, No. 2695 of docket of this court, and the case as reported, 6 Wall. 716 and 15 Wall. 624.

Under the civil law and the textual provisions of our Code, the seller, even in good faith, in case of eviction, is bound (1) for a restitution of the price; (2) for a restitution of all fruits and revenues, which the vendee is obliged to restore to the owner; (3) for the costs; and (4) for all damages which the vendor has suffered, besides the price paid. Civil Code, arts. 2506, 2507, 2510; *Morris* v. *Abat*, 9 La. 557; and *Downes* v. *Scott*, 3 La. Ann. 278.

The possessor in bad faith is bound to surrender the thing immediately, and the seller and warrantor, who took and conveyed in bad faith, is bound forthwith to restore the price to his vendee and to acquit, *i. e.*, discharge, for him his liability to the owner without suit or condemnation. He is in law a usurper, and liable for his successors. Pothier, Cont. of Sale, No. 127.

The complainant's title being incontrovertibly established, as well as the *mala fides* of the defendant, the simple inquiry is, in what manner and to what extent did the defendent delay or hinder restitution? for any delay, much more, any hindrance, was a fault.

The testimony shows: ·

That in 1836 this complainant first commenced her judicial demands against the First Municipality, in whose place the defendant stands, for this property; that six times she has been compelled to go before the supreme court of the United States, upon an appeal or writ of error, in the prosecution of her efforts to obtain restitution, mediately or immediately, from the defendant; that, prior to the year 1855, that tribunal could give no relief, though intimating that they were impressed with the equity of her cause, because she claimed property situated in the state of Louisiana, under a will not probated in that state, and from a testator whose will was declared by the probate courts of that state to be a different instrument, and one which excluded the

complainant; that thereupon, in 1855, complainant succeeded in obtaining the recognition of the genuine last will and testament of her father from the proper tribunal of this state, and in 1860 her right to inherit and recover under that will was authoritatively admitted and decreed by the supreme court of the United States, in the case of *Gaines* v. *Hennen,* 24 How. 615; that, in that case, not only was every point established which was material or requisite to entitle the complainant to vindicate her title to this entire tract of land, and to recover against this defendant, but the court emphasized its decision by the expression of the hope that opposition to rights so clear and, even then, so unduly resisted, would thereafter cease; that this defendant, nevertheless, continued her opposition by a defense to the suit of the complainant against the defendant, in which cause, in 1866, the propositions of law, and the conclusions as to the facts upon which the *Case of Hennen* had been decided, were reiterated by the United States supreme court with this severe rebuke to the defendant: "It was supposed after the decision in *Gaines* v. *Hennen* that the litigation, which had been conducted in one form or another for over 30 years by the complainant to vindicate her rights in the estate of her father, was ended; but this reasonable expectation has not been realized, for other causes, involving the same issues and pleadings, and upon the same evidence, are now pending before this court." See *Gaines* v. *City of New Orleans,* 6 Wall. 716. That the defendant, in the year 1867, joined in the institution and prosecution of a suit known as the Fuentes suit, in which it was attempted to revoke the decree by which the will of 1813, upon which the complainant's rights rested, had been probated; that upon the suggestion by the defendant of the pendency of this Fuentes suit, the circuit court of the United States for this district ordered a stay of proceedings in the causes known as the "Agnelly and Monsseaux cases," which had been brought in that court by the complainant against several hundred of actual tenants of this Blanc tract, who were intermediate warrantees of the defendant, to recover possession and fruits; that these possessory suits were thus made to pause till the final decree in the Fuentes case, whereby, in May, 1877, the prayer to revoke the probate of the will of 1813 was rejected; that the Fuentes suit, of itself, hindered the complainant in obtaining restitution 8 or 10 years; that, shortly after the decision of the supreme court of the United States in *Gaines* v. *City of New Orleans,* numerous parties, tenants upon this Blanc tract, under titles emanating from the defendant, united in a petition addressed to her, in substance, asking that the defendant should acquiesce in the demand of the complainant as the rightful owner, make restitution, and end a useless and already decided contest; but that the defendant refused to comply with this petition, and, through her counsel and attorney, entered upon and virtually conducted the defense against the demand of the complainant for possession and for the fruits of this tract, pending in the Agnelly and Monsseaux cases; that complainant, in May, 1877, recovered judgments for possession and for partial rents for portions of the time of her dispossession, which judgments, there being no appeal, became final in May, 1879; that the insolvency of the tenants in the Agnelly and Monsseaux case is established, and that the former holders of titles derived from the defendant, former occupiers of this tract, are either insolvent or dead, without representation, or cannot be found; that in August, 1879, this suit was commenced; that the answer of the defendant herein, among other defenses, denies all title on the part of the complainant to the Blanc tract; denies that the will of Daniel Clark, of 1813, is valid or operative, and the capacity of the complainant to take under it, and her heirship; avers the complete good faith of the defendant; in short, with a temerity amounting to hardihood, presents and urges, as if new and undecided, all the issues which had been for so many years controverted between the complainant and defendant, and which were decided adversely to the defendant by the supreme

court of the United States in 1860, emphatically reaffirmed adversely to the defendant in her own case in 1867, and decided and practically enforced against the numerous defendants by final judgments in the Agnelly and Monsseaux cases, who were all warranties of the defendant, who had notice and defended, which, by operation of law, rendered these last decrees also judgments against the defendant herself.

This recital, which is but a summarization of the proceedings and adjudications disclosed by the records in the various causes which constitute the litigation between these parties,—this unabating and defiant resistance to rights decreed from the beginning to have been known, and thus solemnly and frequently declared,—abundantly establishes that from the year 1837 to the year 1879 the defendant, with her large resources and power, by unconscionable proceedings, has kept the complainant from the possession of this property, with no conceivable object save the exhaustion of complainant and the consequent retention, as against the defendant's vendees, of the $500,-000 which the defendant had in the year 1837 received for this property, and the evasion of her just liability for fruits. That this is a fault of an aggravated character, the perpetration of which has been persisted in beyond all precedent, cannot be doubted. Civil Code, arts. 2315, 2324; *Irish* v. *Wright*, 8 Rob. 428, 432; *Smith* v. *Berwick*, 12 Rob. 20, 25. That this wrong has been committed under the guise of judicial proceedings cannot exempt from liability. He who, with a motive to deprive another of that which he knows is justly that other's, employs the process and machinery of the courts, is under obligation to satisfy all damages which that other thereby suffers. The damages springing from the legitimate exercise of legal rights, even when there is an absence of malice, and there is good faith, must at least consist in placing the injured party in the situation in which he would have been if the disturbance had not taken place. *Gray* v. *Lowe*, 11 La. Ann. 392, 393; *Sellick* v. *Kelly*, 11 Rob. 150; *Horn* v. *Bayard*, 11 Rob. 263, 264; *Moore* v. *Withenburg*, 13 La. Ann. 22.

The case of *Dyke* v. *Walker*, 5 La. Ann. 519, illustrates the extent to which damages are allowed for injury effected by litigation, for there plaintiffs were allowed compensation for being compelled to go to protest and for loss of credit. When a party makes use of judicial procedure in bad faith, he is subjected to a peculiar and severer rule in the assessment of damages.

The liability of a corporation, municipal or other, for the wrongful and injurious acts of its officers and agents when acting within the scope of their authority, or when the corporation has ratified their acts, is, under the law of Louisiana, settled. *McGary* v. *City of Lafayette*, 12 Rob. 668; S. C. 4 La. Ann. 440; *Rabassa* v. *Navigation Co.* 5 La. 463, 464; *Wilde* v. *City of New Orleans*, 12 La. Ann. 15; and *Gaines* v. *City of New Orleans*, 6 Wall. 716.

Nor does it diminish the liability of the defendant that she has, in

some instances, conducted and urged these defenses in the capacity of warrantor. The warrantor is, by the settled jurisprudence of this state, the real defendant. *Millaudon* v. *McDonough*, 18 La. 108, and cases there cited. The defendant had the right, which the evidence shows she exercised with a guilty knowledge, to assume the conduct of the Fuentes case and the defense of the Agnelly and Monsseaux cases, as well as with the same knowledge to procrastinate the accession of the complainant to her estate by the defense of causes where she was the sole party defendant; but, by so doing, she incurred the liability which rests upon all parties who employ legal process and effect legal hindrance in bad faith, and against what are ultimately declared to be rights of others, and to their damage; she must make full reparation.

The case of *Chirac* v. *Reinicker*, 11 Wheat. 280, is in point, and illustrates the ground of the defendant's liability. In that case, in an ejectment suit, there had been a recovery of possession against a tenant, and a party, other than the defendant in the reported case, had, with the consent of the plaintiff, been admitted to defend as landlord. The court held that, notwithstanding this, if the defendant had derived profit, and had aided in resisting the title of the plaintiff and his recovery of possession by employing counsel and defending the suit, he also was liable for mesne profits.

"An actual occupation of the premises by the defendants, during the period for which damages are claimed, is unnecessary; it is sufficient if he was interested in and derived profits from the premises during that period." Adams, Eject. marg. p. 383.

The question as to the amount of damages is twofold, resulting from the double character in which the defendant is liable.

If we view the complainant as simply substituted in equity to the rights which the vendees, warrantees, would have had, the amount to be recovered would be determined by what had been recovered in the Agnelly and Monsseaux cases.

The evidence shows the defendant was called in warranty in some of those cases, and was notified in all; that she took upon herself the defense, and through her attorney conducted it. The judgment is binding upon the warrantor if he has been called in warranty, or he is apprised of suit having been brought. Civil Code, arts. 2517, 2518, 2519; Code of Practice, arts. 388, 714. The cases of *Vienne* v. *Harris*, 14 La. Ann. 382, and *Late* v. *Armorer*, Id. 826, establish that judgment against the vendee is, *prima facie*, sufficient to authorize judgment against vendor and warrantor, and that when the latter has had notice, though he did not appear, the judgment is conclusive against him. See, also, *Johnson* v. *Weld*, 8 La. Ann. 129, and *Williams* v. *Leblanc*, 14 La. Ann. 757.

The records in the Agnelly and Monsseaux cases were not only properly introduced as evidence in this case, even without the verification afresh by the witnesses of their testimony, which was also had,

but the defenaant, having had notice, and having appeared, is con-
cluded by the judgments therein rendered both as to the eviction and
as to the fruits.

As to the rule to be followed in ascertaining the rents and profits,
the court, in the order of reference, directed the master to take ac-
count, not only of the rents, revenues, and values for use actually
received, but also of those which the evidence showed would have
been received with ordinary good management.    In the Agnelly and
Monsseaux causes, in response to a request of the masters for instruc-
tions upon this point, the court ruled as follows:

"The defendants therefore must, in accordance with the very textual pro-
visions of the law, restore all products of the property which they have pos-
sessed.    They are also liable for the products which they ought to have real-
ized with ordinary good management.    The possessor in bad faith is not
held to the highest possible degree of skill and care, but he must have admin-
istered as a prudent master of a family.    *Winter* v. *Zacharie*, 6 Robinson, 467.
This was a cause in which the defendant had wrongfully possessed a planta-
tion, and he was adjudged not only liable for the fruits which he received, but
those which he could have received with ordinary husbandry; and the doc-
trine is laid down in express terms that the possessor in bad faith must not
only restore the fruits received, but also those fruits which, with ordinary
good management, he ought to have received.    That case was determined in
the first instance after a thorough argument, and an elaborate opinion was
written.    Upon a rehearing the court reiterated their view, and it is the set-
tled law of Louisiana down to the present time.

"This question has been raised in the reports of both masters, whether the
principles already enunciated apply to all lands, improved and unimproved.
They apply to all lands unimproved as well as improved.    The complainant is
not entitled to a recovery for the revenues which might, by the remotest pos-
sibility, have been received by the possessor; on the other hand, she is enti-
tled to all income, revenues, profits, and value for use or occupation which the
evidence establishes she, as owner, would have received or derived whether
the possessor has realized them or not, and whether the failure on his part to
realize them resulted from his not managing the estate with ordinary pru-
dence, or from the estate remaining unproductive by reason of the title thereto
being in dispute on account of a claim of title on the part of the possessor,
now adjudged to have been unfounded."

This is the doctrine distinctly laid down by Mr. Justice BRADLEY
in *Gaines* v. *Lizardi* and *Gaines* v. *New Orleans*, 1 Woods, 105.    This
is the settled rule of the civil law—The Partidas, (Moreau & Carl-
ton's Ed.) vol. 2, p. 1109, tit. 14, law 4: "If the possessor held in
bad faith and was evicted, he would have been obliged to deliver
up the estate, together with all the fruits he had gathered from it,
those which he had consumed, and even the rents and fruits which
he might have gathered from the estate had he cultivated it, inas-
much as he had no right to possess it and has acted in bad faith."

Precisely this principle was laid down by the circuit court of the
United States for the district of Arkansas in *Beebe* v. *Russell*, 19
How. 285, which was an action for fraudulently withholding real es-
tate, and for rents and profits.    According to the statement of the
supreme court in their opinion, wherein they assign their reasons for

dismissing the appeal as premature, the circuit court ordered "that the master take an account of rents and profits received, or which could and ought to have been received." See this principle expounded in Duranton, vol. 16, p. 307, No. 288; Demolombe, vol. 9, p. 96; and MacEldey's Compendium, No. 154. Says Papinian, lib. 62, §§ 1, 6, ff. de rei vindi: "Generally, when the amount of fruits is being inquired into, we must not consider whether or not the possessor in bad faith has reaped fruits, but whether the complainant (owner) might have reaped fruits if he had been allowed to remain in possession. And this decision is also approved by Julian." (Generaliter autem, quum de fructibus æstimandis quæritur, constat adverti debere, non aumalæ fidei possessor fruitus sit, sed an petitor frui potuerit, si ei possidere licuisset—quan sententian Juliaun quoque probat.) See, also, same author, lib. 64, ff. de rei vind. And Paulus, lib. 33, eodem titulo, says: "Not only the fruits that have been gathered, but also those that might have been gathered, must be accounted for." (Fructus non modo percepti, sed ed qui percepi honeste potuerunt, æstimandi sunt.)

1 Du Caurroy, 285, 289, 298, Instit. de Justinien, (Ed. 1826,) says, at page 298, "that the possessor in bad faith must account for all the fruits received, and even for the fruits which, though not received by him, could have been obtained by the owner." (Papin, fr. 62, § 1, Paul, fr. 33, eod. v. sec. de off. Ind.; 1 Moreau de Montalin, p. 596, (Ed. 1824,) and Analyse des Pandretes de Pothier.)

The common law, as stated in Bracton's Laws and Customs of England, gives the same rule: "The jurors will diligently inquire what profits the disseizor had received in fruits, rents, and other commodities. They were also to estimate the advantages the disseizen might have derived from the estate if he had not been disseized." Stearns, Real Actions, 393.

The amounts already in judgments would establish the limit of recovery if there was nothing but the naked liability flowing from the law of warranty. But there is here another ground of liability on the part of the defendant which is to be considered in connection with, but which exists independent of, the warranty. The warranty gave the defendant her moneyed interest in defeating and delaying the complainant in the enforcement of her rights. But it is the unjust hindrance which was the cause and is the measure of the damage; for it cannot be that a wrong-doer can so frame the execution of his wrong as to limit his liability short of complete indemnity. The evidence shows that for 47 years the city of New Orleans has in bad faith kept the complainant out of the possession of her property; that she has done this by using her vast resources and even her power of annually taxing complainant's property for keeping in prosecution a gigantic system of litigation, having for its object to prevent the complainant from possessing and enjoying property which the defendant

knew, and had been judicially decreed to have known, belonged to complainant.

It is not now as warrantor that we are considering the defendant's conduct, but as a person who, from motives springing from her own advantage, has caused to the complainant pecuniary loss, and that, too, when aware of her own wrong doing. From this fact a liability springs up which is not necessarily satisfied by the redress given indirectly through the machinery of warranty; *i.· e.*, the complainant may recover from the defendant all the loss which she suffered for the entire period during which she has been kept out of possession by the defendant.

Of all the writers on the subject of the obligation to redress wrongs and injuries none are more discriminating, or consider the matter in broader relations, than Puffendorf in his Law of Nations. He states (book 3, c. 1, § 3) the division of damage by the civilians into *damnum emergens* (loss which one suffers by diminishing his present goods) and *lucrum cessans*, (damage which one receives by loss of gain which he might have made.)

"All hurt, spoil, or diminution of whatever is actually our own, and all interception of what we ought to receive," the same writer says, entitles us to reparation. At section 4 he enumerates those who are responsible for a wrong as comprising those who give any real assistance in the act of damage, or who, by any antecedent motion or default, caused it to be undertaken, or who came in for any part of the advantage; to those, he says, must be added all *who hinder the duty of restitution*. He cites the case of Probus, a prefect, who, under the Emperer Valentinian, did nothing but protect his clients in unlawful action, and he was held to be responsible therefor; "for here," says the author, "protection of a great patron, interposing, hindered them from making good the damage they had been guilty of."

At the common law, at a time when its maxims were but an utterance of the civil law in another tongue, the disseizor was liable for the possession of his grantees and feoffees, and until the statutes of Gloucester and Marlbridge he alone was liable, and after those statutes the tenants were liable to the extent of the insolvency of the disseizor. In construing the statute, it was held that the damages should still be recovered against the disseizor, if he was able to satisfy them. See a summary of the law on this point derived from Bracton, in Prof. Stearns' Treatise on Real Actions, 389, 390.

See Pothier, Contract of Sale, Cushing's translation, No. 127.

Now, in this case, the evidence establishes that the tenants have been kept from making restitution, and the complainant from receiving it, solely by the defendant, and it is a case where every day of hindrance added fresh loss to complainant.

It must be that a defendant, clothed with such semi-sovereign powers alike for repairing or committing injury, must render to this

complainant, who, after 47 years of resistance, calls it into a court of equity, and shows that it is the author of this deliberately unjust and long-continued dispossession, a compensation equal to her established pecuniary loss.

In the light of these twofold liabilities of the defendant, I will consider the master's report as to the revenues which were and could have been derived. His report enables the court to come to a conclusion on the subject from two distinct processes, sustained by two distinct resources of testimony.

As to the improved property, from an examination of 64 different squares and lots, upon the testimony derived largely from the tenants themselves, he shows, after allowing for all expenditures for ameliorations and taxes, and interest upon the same, a net income, averaging 13 per cent. upon 70 per cent. of the price of adjudication at the public auction at which the defendant sold the same in 1837. This, of course, would be a net annual income of over 9 per cent. upon the entire price. As to the unimproved property, he finds as a fact that it was capable of yielding a revenue from that which so many lots upon the same tract did yield, and states it as at least 5 per cent. upon 70 per cent. of the adjudicated price at said public sale. The evidence fully establishes a further fact that the sole reason which prevented the improvement of the unimproved lots was a fear on the part of pretended owners and of the public that the title of the complainant was well founded. Now, if the improved yielded an annual income of upwards of 9 per cent. net, taking the value as the full price of adjudication, and the unimproved would have been improved but for the doubt which the defendant's wrong inspired as to the title, it follows that 5 per cent. net, at the very lowest, would have been realized, not upon 70 per cent., but upon 100 per cent. of the price of public adjudication.

The second source of evidence upon this point is the sale upon ground rents of property within the city limits and its suburbs. In 49 instances of ground rent reserved by the city, and 46 other cases of ground rent reserved by Daniel Clark, in most cases, for the period of 29 years, some of which still continue, the yearly rent was 6 per cent. upon the fixed value. The rate at which these ground rents were contemporaneously established and continued, by which the income was fixed for long periods, furnishes a sound, independent standard, and corroborates the inference drawn from the 64 cases into which inquiry was made by the master, that the fructual value was considerably above 5 per cent. upon the ascertained value of the land. The case shows a great fact, which fortifies the conclusion drawn from these facts found by the master.

What the value of this Blanc tract should be held to be when it is regarded as a capital from which an income is to be held to have been derivable, is additionally and independently established by the

auction sale of 1837. The adjudication and other evidence show that at the public sale at which the defendant sold these lots there were upwards of .60 purchasers who had the money to pay the adjudicated price. The city had laid out the Blanc tract, with adjoining property, into squares and lots, and 60 different persons estimated the value of, and purchased,. the same at auction.

The concurrence of so many minds as to the value of these lots, thus expressed and recorded, furnishes a criterion as to its productive value, founded upon so many practical judgments, that a court, after a lapse of 46 years, should not lightly disregard it, certainly not upon the evidence in the record; for the case shows that the complainant commenced her assertion to title to this property by suit against the First Municipality in 1836, and from most of the witnesses, even from those who were defendants themselves, come such statements as to authorize the inference that the value fixed by the public sale of 1837 was prevented from continuing to be the productive value by the doubts which the defendant's unjust pretensions threw upon the title. From this fact alone, then, it might safely be considered as established, and the defendant is estopped from denying, that the use of each lot or parcel of this land was yearly worth 5 per cent. upon this auction price.

The rate of 6 per cent. was virtually allowed for the use of such property by the supreme court of this state in the year 1843. See *Erwin* v. *Greene*, 7 Rob. 175. Vacant lots to the value of several hundred thousand dollars had been sold subject to a mortgage, which the vendor agreed to remove. Notes for the price were given, dated at the time of the sale, which was contemporaneous with the period of the public sale here, in 1837, bearing 6 per cent. interest, which were deposited to be delivered when the mortgage should be canceled. The mortgage was not canceled till 1843. The question was whether the vendor should recover 6 per cent interest for the time previous to cancellation of the mortgage. The court answer "yes," for two reasons; one of which was that the purchaser could have had possession, and that by the Civil Code of Louisiana he must pay interest if the property did, in the eye of the law, yield a revenue. The case showed that it was vacant city lots; from which the court inferred it was susceptible of yielding a revenue, "for," says the court, "they could have been rented."

The court ought not to overlook a principle always recognized by the civil authorities, and which is laid down in *Pontchartrain R. Co.* v. *Carrollton R. R.* 11 La. Ann. 258, 259, that even if the evidence as to the value of the rents had been much less satisfactory than it is, and if an accurate estimate of loss had not been attainable upon such clear and full proofs as are here afforded, the defendant having invaded the rights of complainant, and failing itself to furnish more satisfactory proof, would have had to be content with the conclusions to which the court would have been able to arrive from the evidence

which had been produced. See, also, *McGary* v. *City of Lafayette, supra*, where the court, in the assessment of compensation, lay great weight upon *vexatious and incidental wrongs* which have been established.

In short, the burden which bad faith places on the defendant, according to the civil law and the jurisprudence of Louisiana, while it should lead to the assessment of no damages or compensation beyond those actually suffered, requires the court to adopt conclusions fully warranted by evidence, though through the fault of the defendant it must be derived from facts outside of the receipt of actual rents; for, since the law requires the court, in such a case, to go further and decide from evidence extrinsic to actual receipts, it must be admitted that a safe guide may be obtained, and in this case has been furnished, from the rents and profits, for the very period in question, shown to have been actually derived from so many other lots, adjacent, similarly situated, and no better capacitated, from numerous ground rents, and from the opinion of such a multitude of purchasers.

This is a peculiar case. It calls a defendant to a reckoning for 50 years of flagrant and already adjudged wrong. The complainant has already recovered possession. The restitution to which the complainant was and is entitled is founded upon decrees between the parties which establish it conclusively. The hindrance on the part of the defendant and the amount of compensation due are fully proven. The bad faith of the defendant has been previously determined, and is a thing adjudged. The court must not be deterred, by the magnitude of the amount involved, from the application of settled principles of law, and the deduction of conclusions which follow from established facts. The conclusion which must be deduced, after giving all the evidence in this cause its full weight, is that the productive value of the Blanc tract was, in the year 1837, fixed at the public sale, and has not been maintained, but has receded, and has been kept from advancing only by the insecurity as to the title created by the pretensions of the defendant, asserted in bad faith at the outset, and continuously, and persisted in years and years after they had been rejected and even rebuked by the highest tribunal under our government; and that the actual yearly value, which could and would have been derived from the lots constituting the same by the complainant, had she been allowed to occupy them without unjust molestation from the defendant, is established to have been at least 5 per cent. upon the price which they brought when sold by the defendant at public auction in 1837.

The master's account is stated in the precise manner determined to be correct in the case of *Gaines* v. *City of New Orleans*, 15 Wall. 634; *i. e.*, he has stated the account with reference to each lot separately, and has ascertained the rent or income which should have been derived each year, and has computed interest at 5 per cent. upon the same down to January 10, 1881, which point of time h∗

selected for convenience. The master's account shows that the total amount of judgments rendered against the warranties of the defendant in the Agnelly and Monsseaux suits is 576,707.72. This amount, though less than the evidence shows is requisite to indemnify the complainant, cannot be disturbed. It is, to the extent of the periods covered thereby, binding alike upon the complainant and the defendant. A study of his report, and the records of the causes introduced in evidence, shows that, when the complainant recovered the land, she recovered rents for only a portion of the period of her dispossession, often a small one, as the tenants had been in occupation only varying fractions of time since 1837. The proof shows that the earlier intermediate grantees who occupied it are either insolvent, dead, without representatives, or, after search, cannot be found. The balance of the amount, viz., $1,045,363.78, which is the aggregate of the rents and profits which would, with ordinary good management, have been received from the unimproved lots,—i. e., for those periods not covered by the possessory judgments,—is derived from a detailed statement of the rents from each lot, the yearly rental being 5 per cent. upon 70 per cent. of the price of adjudication in 1837. This rate, according to the conclusion of the court, as stated above, is short of what the evidence shows is the true measure of the rent by 30 per cent.; i. e., that the yearly rent, as established by the evidence, is 5 per cent. upon 100 per cent. of the full price of adjudication and sale. The correction required is made by adding 30 per cent. of this sum, where, as has been said, the computation has been made upon a basis of 70 per cent. The amount to be recovered, therefore, would be as follows:

| | |
|---|---:|
| For improved and unimproved land already in judgments, | $ 576,707 92 |
| For balance of rents, unimproved land, | 1,348,959 91 |
| Total, | $1,925,667 83 |

For which last amount, and the costs which have been taxed in the Agnelly and Monsseaux suits, with interest upon that portion which arises from the yearly sums for rent from January 10, 1881, the complainant must have a decree.