## MINAH CONSOL. MIN. CO., Limited, et al., v. BRISCOE et al.[1]

### (Circuit Court of Appeals, Ninth Circuit. October 3, 1898.)

### No. 406.

1. VENDOR'S LIEN — PRINCIPLE GOVERNING ENFORCEMENT—INEQUITABLE CONDUCT OF VENDOR.

 The principle on which a vendor's lien in equity rests is one of natural justice,—that one who gets possession of the estate of another ought not, in conscience, to be allowed to keep it without paying the consideration; and the same principle equally precludes the creation of such a lien on behalf of one who, after transferring the estate, forcibly takes it back and appropriates it to his own use, thereby largely depreciating it in value.

2. SAME—JOINT SUIT BY SEVERAL VENDORS.

 Where a contract for the sale of property for a gross sum is made by a number of owners, who hold different portions of it in severalty, and a suit is afterwards brought by them jointly to establish and enforce a vendor's lien on all the property, the contract must be treated as joint, for all purposes of the suit; and a defense as to one complainant will defeat the suit as to all.

3. SAME—RULES APPLIED.

 Several owners of mining properties entered into a single contract for its sale to a foreign corporation for a gross price, to be paid in part in the stock of the corporation; agreeing to convey a good and indefeasible title. In accordance with the contract, and on receiving part payment, they executed conveyances covenanting for perfect title. A portion of the property, which was the most valuable, was held as claims under mining locations, the title remaining in the United States. Afterwards, having become dissatisfied with the management of the property, and claiming that it was not in accordance with the contract, the grantor of the undeeded claims made a relocation thereof, ejected the company's representative, and took possession of and worked the same for his own benefit until ousted by ejectment proceedings brought by the company. Held, that a court of equity would not, at the joint suit of the vendors, establish and enforce a vendor's lien for the unpaid purchase money.

[1] Rehearing denied.

Appeal from the Circuit Court of the United States for the District of Montana.

This was a suit in equity by John O. Briscoe and others against the Minah Consolidated Mining Company, Limited, and others, to establish and enforce a vendor's lien. From a decree for complainants, defendants appeal.

George F. Shelton and Cullen, Day & Cullen, for appellants.

James A. Walsh, Wm. F. Sanders, O. C. Newman, and A. J. Craven, for appellees.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. The appellant Minah Consolidated Mining Company, Limited, is an English corporation, incorporated under the laws of Great Britain, for the purpose of acquiring and working certain mines situated near the town of Wickes, in Jefferson county, Mont., known as the "Minah Group," and, by complying with the laws of that state, became entitled to transact business therein. On the 23d day of January, 1890, through its attorney in fact, Frederick Bowes Scott, it entered into a contract in writing with the appellees, John O. Briscoe, Annie E. Briscoe, James E. Sites, and the Minah Consolidated Mining Company, a corporation organized under the laws of Montana, who are named in the agreement as the parties of the first part; the English corporation being therein designated as the party of the second part. The contract recites the ownership and possession by the appellees of the mines known and described as "Minah Lot 44, East End," "Minah Lot 49, West End," "Homestake," "Annie E.," "Hillsdale," "Iron Dollar," "Gold Cross," and "Iowa," and the desire of the appellant to purchase the property upon the terms and conditions therein specified. It proceeds to provide that Scott, as agent of the appellant, should inspect the mines "for the purpose of confirming, or otherwise, previous reports made thereon," and, in the event his opinion should prove favorable, he should immediately advise the appellant by cable, and thereupon the appellees should, as soon as possible, deposit in the Second National Bank of Helena, Mont., "title deeds and abstracts showing full and complete title, free and clear of incumbrance, to said property, except a mortgage for thirty-five thousand (35,000) dollars held by the Montana Smelting Company, the payment for which said mortgage shall be duly retained by the second parties from the first payment." It provides that the deeds and papers accompanying them should be duly forwarded by the Second National Bank of Helena to the City Bank, Limited, of London, and by it placed in escrow; that the deeds and papers referred to should be accompanied by an agreement, duly executed by the appellees, empowering and directing the City Bank, Limited, of London, to hold the deeds until the 10th day of March, 1890, with power at any time on or before that date to accept and receive from the appellant company the sum of £20,000 sterling, to be by that bank remitted to the Second National Bank of Helena

for the appellees, together with £75,000 sterling of fully-paid capital stock of the appellant company, issued as follows: To James E. Sites, 6,465 shares, and to John O. Briscoe, 68,535 shares. The contract further provides that, as part of the purchase price of the mines, the total of which is stated to be £230,000 sterling, the appellant company should at the same time deposit with the City Bank, Limited, of London, in escrow, the further sum of £51,000 sterling of the capital stock of the appellant company, issued in the name of J. O. Briscoe, trustee, for himself and others of the first parties, there to remain until January 1, 1891, subject to delivery to the appellant company or its agent upon the deposit in the City Bank of London, Limited, of the sum of £30,000 sterling, with 10 per cent. interest from the date of the contract until paid, in which event the money was to be remitted by the London bank to the Second National Bank of Helena, Mont., for Briscoe, as such trustee. The contract further provides that the balance of the £230,000 sterling, constituting the purchase price of the mines, should be represented by shares of fully paid up stock of the appellant company, issued to one E. L. Schoenberg, who was instrumental in effecting the sale in question, and was to receive 5 per cent. of the cash payment of £20,000, and who was made a director of the appellant company; that if the £30,-000 sterling, with interest as specified, should not be deposited as provided for on or before January 1, 1891, the City Bank, Limited, of London, should remit the £51,000 of the shares of the capital stock of the company to the Second National Bank of Helena, Mont., for delivery to Briscoe, as trustee. It provides that on the making of the first payment, and delivery of the deeds, the City Bank, Limited, of London, should immediately notify the Second National Bank of Helena, Mont., and thereupon such day of notification should be considered "as the date of taking possession of said property for the purpose of determining when title passed," and that in the event the money and deeds should not be deposited as provided for on or before March 10, 1890, the contract should become void. It provides that the sum of £20,000 sterling should be placed in the treasury of the appellant company as a working fund, and that the proceeds of the mines "shall be placed in the Second National Bank of Helena, Montana, in trust, and in the name of E. D. Edgerton, president, as trustee, for each and both of the parties hereto, to secure the further payment of ten thousand pounds sterling (10,000), and on receipt of that sum or amount, either from the proceeds of the mine, or otherwise, if deposited for that purpose, the said bank, by E. D. Edgerton, president, shall pay the same to the said first parties," and that until the full payment of the said £10,000· sterling the mines should be operated under the joint management of a representative of the appellant company and J. O. Briscoe, and in case of any serious disagreement between them the subject-matter of such dispute should be referred to E. D. Edgerton, who should, with or without conference with mining engineers, decide the same as arbitrator. The contract also provides that, in making the first payment of £20,000 sterling, the appellant company may instruct the City Bank, Limited,

of London, to remit the same to the Second National Bank of Helena, Mont., with instructions to retain sufficient thereof with which to pay the mortgage of $35,000, until that mortgage should be paid and satisfied of record. Another provision of the contract is that the appellant company shall pay the appellees "the purchase price of the steam hoist now on said property," or allow its removal. There are still other provisions,—not, however, important to mention.

The case shows that, as a matter of fact, the appellees, who were complainants in the court below, were not joint owners of the mines in question. The Minah Consolidated Mining Company of Montana held the title to the Minah Lot 44, East End, Homestake, Hillsdale, and Iowa. James E. Sites and Annie E. Briscoe, who was the wife of John O. Briscoe, held the title to the Minah Lot 49, West End. The title to the Annie E., Iron Dollar, and Gold Cross was in the United States. Each of the three last-mentioned claims had been properly located under the mining laws of the United States. The Annie E. and Iron Dollar, which were the most valuable of the entire group, were located by John O. Briscoe, who afterwards deeded his interest in them to his wife, Annie E. Briscoe, as he also did his interest in the Gold Cross. Thereafter, and at the time of the execution of the contract here in question, the locations of the Annie E. and Iron Dollar stood in the name of Annie E. Briscoe, and that of the Gold Cross in the name of James E. Sites and Annie E. Briscoe, and as such respective claimants they were in the possession of their respective claims. For the Annie E. claim, proceedings were pending in the proper United States land office in the name of John O. Briscoe, and for the Iron Dollar claim in the names of John O. Briscoe and Charles F. Blake, for the purpose of obtaining the government title thereto; and, although in those proceedings the respective applicants had made the requisite payments and deposits as far as the proceedings had progressed, the necessary proofs to establish the applicants' rights had not been made, and consequently no evidence of title to either of those claims had been issued by the government. For the Gold Cross claim no proceedings had been initiated in the land office looking to the acquisition of the government title. Notwithstanding the fact that no interest in any of the claims appeared of record in John O. Briscoe at the time of the making of the contract of January 23, 1890, it appears from his own testimony, in more than one place, that he retained an interest in the Annie E., Iron Dollar, and Gold Cross claims; and that he was the moving and controlling spirit on the part of the vendors in all of the negotiations in question, abundantly appears from the record in the case. Scott's report being favorable, three deeds were executed to the appellant company as grantee,—one by the Minah Consolidated Mining Company of Montana, for the Minah Lot 44, East End, Homestake, Hillsdale, and Iowa; one by James E. Sites, John O. Briscoe, and Annie E. Briscoe, for the Minah Lot 49, West End, and Gold Cross; and one by John O. Briscoe and Annie E. Briscoe, for the Annie E. and Iron Dollar claims. These deeds, with certain abstracts of title to the property therein described, were deposited by the appellees with the Second

National Bank of Helena, Mont., and by it forwarded to the City Bank, Limited, of London, for delivery to the appellant company upon the payment and delivery of the money and stock as provided for by the contract of January 23, 1890. Duplicate deeds had been executed by the respective grantors, and on March 7, 1890, deposited with W. E. Cullen, at Helena, Mont., in escrow, to be by him duly recorded upon being notified of the payment and deposit by the appellant company at the time and as provided by the contract of January 23, 1890. That payment and deposit were made March 10, 1890; and, Cullen being duly notified thereof by cable, he caused the deeds to be duly recorded in the proper county March 11, 1890. A few days thereafter a representative of the appellant company entered into the possession of all of the mining properties mentioned, and in connection with John O. Briscoe, representing the grantors, commenced working the mines. Thereafter the company deposited, from the proceeds of the mines, $4,224.80 with the Second National Bank of Helena, to be, and which were, applied on the £10,000 payment provided for by the contract of January 23, 1890. It has made no further payment thereon, and as a consequence this suit was commenced by Briscoe and his associates to enforce an alleged vendor's lien for the balance of that payment on all of the mining property described in the contract of January 23, 1890. Such a lien is never created by contract. Equity creates and enforces one in proper cases, and, when recognized in the state in which is situated the property in respect to which it is asserted, the federal courts will recognize and enforce it. Gold Mines v. Seymour, 153 U. S. 509, 14 Sup. Ct. 842; Fisher v. Shropshire, 147 U. S. 133, 13 Sup. Ct. 201. The principle on which such a lien rests is one of natural justice,—that one who gets the estate of another ought not, in conscience, to be allowed to keep it without paying the consideration. Chilton v. Braiden's Adm'x, 2 Black, 458; Story, Eq. Jur. § 1219; Baum v. Grigsby, 21 Cal. 172. In Redfeld v. Woodfolk, 22 How. 318, 327, the supreme court said:

"A court of chancery regards the transfer of real property in a contract of sale, and the payment of the price, as correlative obligations. The one is the consideration for the other; and the one, failing, leaves the other without cause."

In the view we take of this case, many of the questions argued by counsel need not be decided. Assuming that, if the equities justify it, a court of equity may create and enforce a vendor's lien in solido upon separate and distinct parcels of land in favor of owners jointly who have no common interest in the property sold, where, as here, there is a joint contract for the sale of all of the parcels for a lump sum, yet the fundamental question remains, are the facts such as to justify a court of equity in creating and enforcing a lien in behalf of these vendors? Undoubtedly what the appellant company contracted for, and what the appellees agreed to convey by the contract of January 23, 1890, was "full and complete title" to all of the mines therein described, subject to a certain mortgage thereon, payment of which was provided for out of the first cash payment to be made under the contract. It is so expressly declared in the con-

tract itself. If the contract is to be regarded as a joint contract for the purpose of creating a lien on the properties contracted to be sold and conveyed, it must, of course, be also regarded as joint in respect to the obligation to convey them. Confining our observations, for the sake of brevity, to the Annie E. and Iron Dollar claims,—the two most important and valuable of the group,—it is said for the appellees that the abstracts of title to them, deposited with the Second National Bank of Helena, and by it sent to the London bank, disclosed to the appellant company the true state of the title to those claims. This may well be doubted. Those abstracts are printed in the record. That of the Iron Dollar claim, being Complainants' Exhibit 1, shows that J. O. Briscoe located the claim March 20, 1886; that he and his wife conveyed an undivided one-half thereof on July 23, 1886, to Charles F. Blake; that September 12, 1887, Briscoe and wife and Blake deeded the claim to the Minah Consolidated Mining Company, which company on January 26, 1889, deeded it to Annie E. Briscoe. The abstract concludes with this statement: "Recapitulation: Annie E. Briscoe now owns the lode." The abstract of the Annie E. claim shows that J. O. Briscoe located it January 20, 1887, and on December 9, 1887, deeded it to Annie E. Briscoe. This abstract also concludes with the statement: "Recapitulation: Annie E. Briscoe now owns the lode." Both abstracts are entirely silent as to any proceedings in the United States land office, or as to any patent or other evidence of title from the government. As the government is the source of title, with notice of which the appellant company is properly chargeable, it may be properly said that the abstracts did not themselves show the truth of the declaration therein contained, to the effect that Mrs. Briscoe was then the owner of those lodes. But that is all. It cannot be properly said that they showed that she was not the owner. Prudence on the part of the appellant company would undoubtedly have required an abstract showing the "full and complete title" contracted for. It perhaps rested upon the assurances of title given in the deed of warranty, a duplicate of which was executed by John O. Briscoe and his wife, Annie E. Briscoe, on March 6, 1890, and by them deposited on the next day (March 7th) with W. E. Cullen, in trust, to be by him recorded on behalf of the grantee on receipt of a message announcing the payment of the money and deposit of the stock by the appellant company in accordance with the contract of January 23, 1890. That deed contained, among others, this covenant:

"And the said parties of the first part, for themselves and their heirs, executors, and administrators, do hereby covenant, promise, and agree to and with the said parties of the second part, their successors and assigns, that the said parties of the first part at the time of the sealing and delivery of these presents were lawfully seised in fee simple of a good, absolute, and indefeasible estate of inheritance in fee simple of and in, all and singular, the said premises, with the appurtenances, and have good right, full power, and lawful authority to grant, bargain, sell, and convey the same in the manner aforesaid."

John O. Briscoe on the 9th day of March, 1890, cabled from Helena, Mont., to the appellant company, at London: "Cullen has deeds. Will you pay Monday?" And when, on March 11, 1890, Cullen was

notified of the payment and deposit by the appellant company on the 10th day of March, 1890, as provided for by the contract in question, he forthwith recorded the deed in which the grantors declared their ownership in fee of the Annie E. and Iron Dollar claims.    The deeds for the other mines were delivered and recorded at the same time, and a few days thereafter, to wit, March 18, 1890, the appellant, through its agent and representative, J. C. Peters, entered into the possession of all of the properties.    Although the contract of January 23, 1890, provided that the appellant company should have the privilege of purchasing the steam hoist which was then on the Annie E. claim, "or allow its removal," the record shows that between the 10th day of March, 1890, when the contract became binding, and the 18th day of March, 1890, when the company was put into possession of the mines, John O. Briscoe removed the steam hoist used in working the Annie E. claim, without the consent or knowledge of the company.    This was a clear breach of good faith, and a violation of the contract of January 23, 1890.    With Peters, as its representative, and John O. Briscoe, representing the vendors, the appellant company commenced working the mines.    Peters and Briscoe soon disagreed; the latter claiming, apparently with truth, that Peters was not a competent miner, and that the management was extravagant and inefficient.    As showing the nature and extent of that quarrel, we extract from some letters written by Briscoe to the appellant company and its representatives.    In a letter of date March 27, 1890, Briscoe wrote to Scott, then in London, as follows:

"Under my contract with the M. C. M. Co., Ltd., I am a joint manager with the company's representative; E. D. Edgerton acting as arbitrator when we disagree.   This joint management means full power to operate the mines, sell the ore, employ the supt., foreman, bookkeeper, assayer, buy machinery, etc., etc.   It either means this or it means nothing.   It is true that the Co.'s representative, Mr. Peters, is subject to orders of the Co.'s trustees or yourself, if empowered by the trustees to represent them, and you may fix his salary, send him his orders, and discharge him at your or their will.   But this is not true of myself.   I am an employé with an interest. My employment is a part of the consideration of the purchase.   It is for a fixed time.   The conclusion following this is that I will manage the mines, in connection with your representative, for all of the purposes above stated; that, where I do not agree with the company's ideas as announced through your representative, the arbitrator will be called in to settle the difference.   You can see from this that your representative has no sole power in anything pertaining to the mine.   The Co. or its trustees have nothing whatever to do with the management, except to express their desire through their Montana representative.   Also, in this connection, I beg leave to say to you that the development fund, so far as needed to be expended in the development and operation of the mines, is also under and subject to the control of these joint managers, and neither can do anything pertaining to the business without the consent of the other.   In future remittances for this fund, I would suggest that the sum remitted be placed to the credit of the Minah Consolidated Mining Company, Limited, and not to Mr. Peters' credit.   In all these matters, I beg that you will not think that I am finding fault, but am trying simply to get this business on a strictly equitable basis, where there will be no friction.   You may perhaps labor under an impression that Mr. Schoenberg holds the balance of power in our organization; so I deem it best to say to you that he has no stock, and no promise of any from me until the final money is paid, and in the meantime I own and

control the one hundred and twenty-six thousand shares. I say this that you may see how dear the success of the new company is to me, and realize how jealous I would naturally be for its good repute and future success."

In a letter of date June 12, 1890, addressed to the secretary of the appellant company, at London, Briscoe first makes reference to the steam hoist, and then to the trouble with Peters. We extract from that letter as follows:

"Noting your expression under date of April 26th, where you say: 'I am also to express the surprise of my directors upon hearing that between the 10th March and 18th, the day upon which Mr. Peters took possession of the mine on behalf of the Co., you removed the steam hoist and pump, which, according to the terms of the contract between the company and yourself, dated 23d January, 1890, the Co. had the right to purchase.' Why your directors should be surprised is beyond my comprehension. There is nothing in my contract requiring me to leave the hoist and pump on the property sold to the company. The right of the company to purchase the hoist and pump has never been questioned. The contract itself recognizes the right of ownership in me, which carries with it the right to remove it. If the company had any intention of buying the hoist and pump, they should at some time have so indicated. In the same copy of your letter referred to, you say that your directors cannot accept my interpretation of the joint management, but you fail to notify me what their interpretation is. So far, I have been a joint manager in name only. You say the company has sent instructions to Mr. Peters. You fail to send me a copy of such instructions, or intimate to me what they are. Mr. Peters denies point blank that he has received any instructions. I cannot longer permit the mines to be mismanaged as they have been since Mr. Peters' incumbency. I shall take active charge to-morrow of the development and sale of the ore product. This will result favorably to the reputation of the mine, and, if it is the intention of the present board of directors to make the mine a success, I have no fear that my management will be satisfactory. Let that be as it may, I shall occupy that position until the ten thousand pounds are paid. The distance is too great, and the correspondence too slow, to recite to you by letter the aggregation of mistakes and the pig-headedness of the gentleman who assumes to be a miner, and to have the ability to be mine superintendent and the managing director of mines."

In a letter written two days later by Briscoe to the secretary of the appellant company, at London, he says:

"Yesterday's daily newspaper announced that 'the Minah Mine, at Wickes, is closed down.' I went to the mine at once, and found that Mr. Peters had discharged all the men who were working on ore, stopping the ore output altogether; his explanation to me being that he 'received peremptory orders from Mr. Schoenberg to reduce the monthly expenses to $3,000.' I do not understand this move. Mr. Schoenberg, presumably acting under instructions from your office, purchased a steam hoisting plant, and had it placed at the Annie B. winze, and the water pumped out, and the levels cleaned up. This costs considerable money, and the pump has to be kept running, at a daily expense of $5 for fuel, to keep the water down. Mr. Peters had discharged all of the men who were working at this point in the mine. The assayer had sampled this vein in the lower workings, and had found two feet of solid ore that assays $39 per ton in gold and silver. This ore would net the company, above freight and smelting charges, over $20 per ton. I found that Mr. Peters had also laid off all the men in the stopes above tunnel No. 2. The ore being mined there at the time assays from $45 to $200 per ton. The ore developed below tunnel No. 2 had no one working in it, and Mr. Peters unwilling to have any one work there. Thus, the situation stands this way: The present working force at the mine is:

| | | |
|---|---:|---:|
| J. C. Peters, services for month | $ 350 | 00 |
| "        average traveling expenses, hotel, and room | 100 | 00 |
| "        body servant | 90 | 00 |
| Kanouf, bookkeeper | 100 | 00 |
| Hand, assayer | 150 | 00 |
| Kane, foreman | 180 | 00 |
| Turner, foreman | 150 | 00 |
| Carpenter | 120 | 00 |
| Blacksmith | 105 | 00 |
| Fuel boiler | 125 | 00 |
| 4 miners running tunnel No. 4 | 400 | 00 |
| 2 trammers, "    "    "    " | 180 | 00 |
| | $2,050 | 00 |
| This leaves available for powder, fuse, and caps for tunnel No. 4, $200; for timbers, $100 | 300 | 00 |
| | $2,350 | 00 |

—Leaving available funds to pay for ore output the sum of $650 per month. How is this for management? I have previously said nothing about these matters, as the monthly reports of Mr. P. would perhaps enable you to make the above deductions. If you have not the necessary money to do the developing of the mine properly, then I suggest that you stop the development entirely for the present, and devote your funds exclusively to getting out ore. If $3,000 is all that the company can afford to expend per month, I will make this proposition: I will personally superintend the mine for 60 or 90 days without compensation. I will do without the valuable services of Mr. Peters, his body servant, and bookkeeper, discharge one of the foremen (take his place myself); thus saving $840 per month. I will stop all the dead work, and apply the whole $3,000 to payment of ore output. At the end of 60 or 90 days, you can then appoint some competent manager, and should select some one who has had the necessary experience, and the prestige of having successfully managed something. Mr. Hand and myself can keep the books of the Co., so that you can have no fear of things getting mixed up during the interregnum. I make this proposition because—First, I do not approve the reckless expenditure of the development fund; second, because Mr. Peters has no practical knowledge of operating the mine. After writing you on the 10th of June, I went to the mine and started the work, as stated in my letter. Mr. Peters immediately countermanded my orders to the foreman. I was taken sick, and have just now sufficiently recovered to take active charge. You should know that I have more interest than any one else in making the mines a success. I could easily protect my authority by appealing to the courts, but do not wish to do this, as it will injure the company's operations in more ways than one. I have sent a copy of this letter to Mr. Schoenberg, at Philadelphia, and will expect a cable from you on receipt of this letter."

The friction between Peters and Briscoe increased until the joint management became little, if any, more than nominal. Under Peters' control the operations of the properties became so unsuccessful that on the 18th day of August, 1890, the company stopped all work and closed the mines. Briscoe testifies that in response to his letter of July 14th, above referred to, he was notified by the secretary of the appellant company that Scott would go to Helena about the 1st of September, with power to act, and that he arrived there, when this conversation occurred between them:

"Mr. Scott said, in substance: 'We have no money. We cannot carry on the mine. We have shut down because we have not the money. You have proposed in your letter that you would take hold of the mines and operate them, and pay the vendors the balance of the ten thousand pounds out of

the proceeds of the ore. Now, the company cannot raise the money to operate the mine while you were doing this.' To which I replied: 'You need not raise the money. I will take the expenses of operating out of the proceeds of ore, and apply the balance on the sum of ten thousand pounds.' He said: ' 'Mr. Briscoe, what assurance have you that you can make the amount of ten thousand pounds out of the proceeds of ore, and pay the expenses, and how long would you wish to do it in?' I said: 'Mr. Scott, I will undertake within one year to pay the expenses of operating the mines out of the ore, and pay ourselves the full sum of ten thousand pounds, less the amount which has already been paid; and, if you are satisfied to do that, I will work the mines myself without charge for my services. I will keep the salaried force as I suggested in my letter; the books will be open to your inspection at all times; and I will guaranty within one year that you shall have your . ten thousand pounds paid. If I fail to pay out of the proceeds of ore the balance of the ten thousand pounds, I will undertake to give you a clear receipt for it, anyway. I have that much confidence in my ability to manage the mines.' Then I said: 'When that is paid, we will perfect the title to the Annie B. and the Iron Dollar, so that your company will have a perfect title to those claims.' Mr. Scott made a minute of that conversation; said that that would be satisfactory to him,—he would agree to it upon the part of the company. I then asked him for his credentials. He showed me a copy of his power of attorney, or his original power of attorney,—I don't know which. I have a copy of the power of attorney. Mr. Scott then suggested that· we go over to his attorney's office,—Mr. Shelton's office,—and have this agreement, which he had noted down, reduced to writing. We ·went there, and, I before stated, we were put off until the next morning; and the next morning Mr. Shelton informed me in the presence of Mr. Scott that he had advised Mr. Scott not to enter into this contract with me. I said to Mr. Scott: 'Don't make any mistake about this matter. If you will only keep the contract you now have with me, I am satisfied with that, and want no other. This is a suggestion that emanates from you, and I have agreed to it, and I am perfectly willing to go on with it, but I much prefer that you keep the contract as already between us.' "

In answer to this question by Mr. Shelton:

"Q. Did you, or did you not, state to Mr. Scott at the time of your interview in my office on September 5 or 6, 1890, that the Annie B. and Iron Dollar lode claims, being unpatented, could not be held by an alien corporation, and that they were subject to location by any qualified locator under the laws of the United States?"—Briscoe answered: "A. I think I told Mr. Scott that Judge Cullen had made a statement of that kind,—that unpatented property could not be held by an alien, and that they did not have any title yet to the Annie B. and Iron Dollar claims, and would not have until they paid that ten thousand pounds. I think I said that to him, Mr. Shelton. Q. Mr. Briscoe, is it not a fact that the ground upon which I based my objection to the execution of the new agreement proposed between yourself and Scott was that it was in alteration of original contract, and that it would be necessary for the vendors to all agree thereto, as well as for the representative of the English company, before a valid alteration of the contract could be made? A. I think Mr. Shelton made some such statement, but I don't think that that was the basis, nor that he believed that it was necessary, for the reason that I was making a contract for myself alone, and was perfectly competent and responsible to carry out my contract, and it need not, in any way, shape, or manner have affected the contract between themselves and the other parties, if the proceeds of ore were applied, and if I chose to pay the unpaid portion in case there was any, it was none of their business. I think, however, there was another ground that served as a basis. * * *"

The record shows that a few days after this conversation, to wit, on the 8th day of September, 1890, Briscoe went upon the Annie E. and Iron Dollar claims, and located them as the "Protection" and "First Law" quartz lode-mining claims, respectively, and immediately deeded

his interest therein to his wife, Annie E. Briscoe; recording the deed, together with the notices of location, September 10, 1890. On September 12, 1890, he wrote this letter to Peters:

"Wickes, Mont., Sept. 12, 1890.

"J. C. Peters, Esq.—Dear Sir: You are hereby duly notified that the quartz lode-mining claims heretofore known as the 'Annie B.' and 'Iron Dollar' quartz lode claims were duly located Sept. 8, 1890, as the 'Protection' and 'First Law' quartz lode-mining claims, and were duly recorded Sept. 10, 1890; that said last-described claims are the property of Anna E. Briscoe. "[Signed]                                    Anna E. Briscoe,
                                    "By John O. Briscoe, Her Agt."

On the 10th of September, 1890, Scott located the Annie E. and Iron Dollar claims under the names of "Vantage" and "Fair Play," respectively; and on the next day (September 11, 1890) Briscoe addressed this letter to Scott:

"Wickes, Montana, Sept. 11, 1890.

"F. B. Scott, Esq., Helena—Dear Sir: Anticipating your action of yesterday, and in order to protect ourselves and such interest as the M. C. M. Co., Ltd., might have, I, on 8th inst., located on the heretofore known claims as the 'Annie B.' and 'Iron Dollar.' They were duly recorded at Boulder yesterday, the 10th inst., and are the property of Annie E. Briscoe, Now, that you have tried every move and failed, don't you really, honestly think that I can manage the interests of the M. C. M. Co., Ltd., and take better care of them than any one whom you know? I will be in Helena to-morrow, provided you wire me at Wickes, before train leaves, that you will be there."

Notwithstanding Briscoe states in the letter last quoted that, in anticipation of Scott's locations of the 10th, he had on the preceding 8th of September located the Annie E. and Iron Dollar claims, he testified, in answer to this question by his counsel:

"Q. When did you first learn that Mr. Scott had repudiated the former titles to those properties, and assumed to acquire an original title from the United States in himself?"—as follows: "On the 10th day of September, 1890."

Briscoe further states in his testimony that he took possession of the Annie E. and Iron Dollar claims at the time he located them under the names "Protection" and "First Law," respectively, on the 8th day of September, 1890, and was there when Scott undertook to locate them two days later under the names "Vantage" and "Fair Play," respectively, and that, Scott having left Peters there, he (Briscoe) ejected him. Scott afterwards sued Briscoe and his wife, in one of the state courts of Montana, to recover possession of the Annie E. and Iron Dollar claims, in which action he was nonsuited; and on the 24th day of November, 1890, the appellant company commenced an action of ejectment in the United States circuit court for the state of Montana against Briscoe and his wife to recover the possession of the Annie E. and Iron Dollar claims, together with $20,000 damages for their unlawful withholding, and $50,000 as the value of the rents and profits thereof. 47 Fed. 276. That action resulted in a judgment for the plaintiff for the restitution of the premises sued for, and damages in the sum of $7,500. From the time that Briscoe dispossessed the appellant company to November 20, 1891, on which date he and his wife were dispossessed under a writ of restitution issued on the

judgment recovered by the appellant company against them, they withheld the possession of the Annie E. and Iron Dollar claims from the appellant company, and during their unlawful occupancy extracted therefrom large quantities of ore, which they appropriated to their own use. In a deposition given by Briscoe in the action brought by Scott against himself and wife, and introduced in evidence in this suit, he was questioned, and testified, as follows:

"Q. How many tons of ore have you, as the agent of Anna E. Briscoe, extracted from these mines since the 12th day of September, 1890? A. I cannot say; possibly fifteen hundred tons. Q. What have you done with this ore which you have extracted? A. I have sold most of it. Q. What has been the assay value per ton, about, on an average? A. I cannot say; but, if desired, I will have the bookkeeper make up a statement and attach it to this answer: provided my attorney advises me that you are entitled to it, and that you pay the proper price to the bookkeeper for the services. Q. Have you had this ore that you have extracted from these mines sampled at your sampling works? If so, what and where? A. Yes; Tacoma S. & R. Co., United Smelting Co., Montana Smelting Co., United States Public Sampling Works. Q. Has this' ore which you have extracted from these mines paid expenses, and netted you a profit? A. They have. Q. What has been the average cost per ton, as near as you can estimate, of getting this ore into cash? A. The mining and hauling, about $11 per ton; the sampling, $2 per ton; and $16 to $21.50 for smelting and freight. Q. Give an estimate of the net profit per ton, as near as you can, of the ore. A. I think $5 per ton would cover it. Q. Are you operating the mines at this time? A. I am. Q. How many tons of ore per day are you extracting? A. Say 300 tons per month. Q. Is this ore as rich or richer than the ore you have mentioned above? A. Yes, some of it; a great deal richer."

It is said for the appellees that the value of the ore so extracted from the Annie E. and Iron Dollar claims is conclusively determined by the judgment entered in the action of ejectment brought by the appellant company against Briscoe and wife. Let that be admitted, and the fact is not altered that they agreed and undertook to sell and convey to the appellant company the fee-simple title of the Annie E. and Iron Dollar claims, receiving a part of the purchase money therefor, and thereafter themselves dispossessed their vendee, and largely despoiled the property. Under such circumstances, how can a court of equity, which regards the transfer of the property and the payment of the purchase price as correlative obligations, be expected to create and enforce a lien on behalf of the vendors? The principle of natural justice upon which such liens rest, that one who gets the estate of another ought not, in conscience, to be allowed to keep it without paying the consideration, equally precludes the creation of such a lien on behalf of one who, after transferring the estate, forcibly takes it back and appropriates it to his own use. If there is anything well settled in equity jurisprudence, it is that one who comes into a court of equity, reasonably expecting relief, must do so with clean hands. It is no answer at all to say, as do the appellees, that the appellant company failed to carry out its part of the contract of January 23, 1890. If so, the courts of the country were open to them, and afforded ample protection to their rights. The unlawful dispossession of the vendee by the vendor, and the unlawful extraction and disposition by the latter of a material portion of the estate agreed and undertaken to be conveyed, are surely enough to preclude a court of

equity from creating and enforcing a vendor's lien in behalf of such wrongdoer. The suggestion that these wrongful acts of Briscoe are not binding on his co-complainants has already been answered. It is only by regarding the contract of January 23, 1890, as a joint contract, that a vendor's lien in behalf of the complainants on the properties contracted to be sold and conveyed could be created. If it be regarded in that light for the purpose of creating a lien, it must be so regarded in respect to the obligations thereby imposed.

Entertaining these views, it becomes unnecessary to detail the subsequent facts appearing in the record, or to consider any other question in the case. The judgment is reversed, and the cause remanded, with directions to the court below to dismiss the bill at the complainants' cost.